Good morning, Your Honors. Good morning. Tom Johnston for Plaintiff Appellant, Washington Mutual Inc. This case arises from a transaction in which FISLIC provided home savings with regulatory incentives to induce home to relieve FISLIC of a costly obligation to liquidate three insolvent thrifts. This Court previously recognized that the excess of the thrifts liabilities over their assets was home's cost of acquiring the FISLIC assistance. The Court remanded this to the District Court to determine the amount of that cost and to allocate the cost among the three principal items of FISLIC assistance. So the question for me is, did you meet your burden of proof to introduce sufficient evidence to permit the finder of fact, Judge Rothstein, to quantify what each of those components was worth? Isn't that what the case boils down to? Exactly, Your Honor. Okay. Yes. Why wasn't it possible that the Missouri branching right had a negative value? It seems to me that our prior authority establishes that the net of the, I'll call it the incentive package, had some cost basis to it. I mean, clearly. But wouldn't it be entirely consistent with that result that the Missouri branching right had a negative value? I guess it's theoretically possible, but any branching right, the right to go into a state and take deposits, actually had value. In this case, that was not the objective. Well, I don't know, Counsel. Holm didn't really want the Missouri branching right. My understanding from the record is that that was a requirement of FISLIC. Is that? Correct. Correct. But it's a matter of cost. Holm did not want to pay the amount by which the Missouri thrifts, there were two of the thrifts in Missouri, that were underwater to gain access to Missouri. FISLIC wanted more for the Florida branching right than the amount by which Southern, the Florida thrift, was underwater. And that was the deal. That doesn't mean that Missouri had no value. It was not a priority. So did it come down to, we'd rather be in Florida, but we can only get there by taking Missouri? Florida was a healthy growing market. Missouri, one of the problems with Missouri was gaining scale because it separated St. Louis on one end, Kansas City on the other. And I'm not going to say nothing in between, but a lot of Missouri was a farmland. Oh, that's sort of mean. That made it less attractive. But from a banking standpoint, Florida was a better environment to grow their business. Yes. I like Missouri. And so it was important that we did allocate more, proportionately more of the value to Florida than to Missouri. Sure. But getting back to Judge Tallman's question, if it is a theoretical possibility, which I think is the answer you gave me to my question, that Missouri might have even had a negative value, how did your client meet its burden of proving the cost basis here, the value in the aggregate right, the aggregate incentive package? The value of the aggregate incentive package? That wasn't a question that... Well, it is. There's some cost basis. We just established that. There's some cost basis in the, what I'm calling the incentive package, right? Yes, but the court didn't reach that issue. Well, what the court decided is that you couldn't, your client hadn't proven the Missouri component, the Missouri branching right component, right? Yes, but it wasn't additive. There was a cost basis. In other words, there was an amount that Holm paid, the excess of the liabilities over the value of the thrift assets, that determined its cost basis. Then we're allocating that on fair market value. What was before the court was merely an allocation. It wasn't, it didn't have to determine the fair market value of each of the components other than to allocate the cost basis. But one of your biggest problems from a proof standpoint is the trier of fact did not afford as much credibility as you wanted her to your expert and to his valuation model. And it seems to me that if the finder of fact listens to the expert and essentially says, I just don't buy the expert's model, you've got a big problem because then there's no way to arrive at a number of either the entire package or the individual components. It wasn't the model, and maybe I'm parsing words here, it wasn't the model. The model was a simple discounted cash flow method. It was a textbook. But it had a lot of variables and that's, I think, what troubled Judge Rost. Exactly. It was the inputs. Yeah. And assumptions. Right. The inputs and the assumptions. But in that case, Your Honor, it's the obligation of the trial judge, and trial judges do this every day, to make a finding based on the evidence in the record. There was other evidence in the record, and in fact, in the trial judge's interest rates had been lesser, that would have reduced it by, I think it was 60 percent. If the deposit capture had been lesser, it would have reduced the value by 50 percent. So the trial judge had evidence in the record, and the trial judge was aware of how to manipulate that, plus the trial judge could have asked the plaintiffs or the defendants or the parties together. You're stepping into some interesting area about trial judges, obviously. What is it that you would like to have had the district court do? You seem to just not like the decision that the district court made, that the underlying principles that were utilized, I don't think that you're arguing, were improper or incorrect. Am I right? Yes. You just don't like the decision. No. The trial judge didn't honor the burden of proof. The trial judge stated the burden of proof in terms of certainty and specificity and held us to numbers and inputs. If the trial judge disagreed, and obviously the trial judge did disagree with some of the inputs, the burden was on the trial judge to put in other inputs, lower inputs. So where does your burden of proof end? I think there are some holes the trial judges fill. I don't think there's any question about that. And to me, when I read this record, it seemed to me it was just a question of degree. How much do we really expect the trial court judge to do for you? And some of these holes look pretty gaping to me. Is it your position that she had what she needed to fill all of them? She had what she needed to fill all of them. Your Honor, I'm not arguing that there could never be a failure of proof. There are failures of proof. Typically, those failures of proof are where there's a lack of substantiation. In other words, I went to the track, and I want to deduct my losing bets as well, and I have no records. And that's the Cohen case, essentially, right? Yes. Another 9th Circuit case is I have a basis in this partnership. I put in $100 30 years ago, and geez, it's worth a lot today, and I must have a higher basis. But to get back to, I think, where Judge Kristen is going with her question, you waived a jury here. You could have tried to present this to a jury of lay people. I totally understand why you made the decision that you made. You are correct, Your Honor. It's very rare in tax cases. Yeah, I can imagine. But had you done that, we would not have had the detailed findings of fact and conclusions of law that we have from the fact finder. We would have had a verdict. Now, you might have offered some special interrogatories to the jury, but suppose that all we got from the jury was taxpayer loses or the amount is $100 million and here's how we divide it up. You would then, the government would then be up here saying there was insufficient evidence in the record to permit a rational trier of fact to arrive at that result. And it seems to me what we've got here is sort of the mirror image of that with the district court as the fact finder. The question is, did you give her enough tangible evidence from which she should have been able to reach a decision? Yes. And let me respond to that in a way that we pointed out in our reply brief at page 12, that if one were to take the values that the defendant didn't actually do a valuation, but during trial, values came out. The experts, the defendant's numbers, for example, on the branching rights, they said it was at least 48 million. If you were to come up with the wrap rights, they thought it was more of an insurance policy, but it was worth around $7 million. Right. So some of that could have been used to plug some holes, right? That's right. And if you took those, those two numbers, the 48 and the 7, and allocated on that basis, the allocation wouldn't have come out a whole lot different from what we did allocate. And is it your position, counsel, that, again, I think you've answered this question, but it's really your position that there was testimony like that sufficient to plug all these holes? Yes. Okay. Absolutely, Your Honor. Even though the finder of fact found the testimony, I don't want to say not credible, but not as reliable as you would urge the finder of fact to rely on. Well, in this case, absolutely, Your Honor. And if one looks behind some of the cases that we cited in the brief, for example, the Capitol Blue Cross case, which I think is fairly parallel, reading that opinion, one might come to the conclusion that the errors were minor. But, in fact, how did the trial court describe those errors? The trial court in the Third Circuit, Capitol Blue Cross, said that it had found a litany of perceived errors. That's a quote, and it's at 431, Fed 3rd, 131. And that the expert's valuation was so uncertain to be almost meaningless. And that one's at 431, Fed 3rd, 134 to 135. Those are substantial errors, and yet the Third Circuit held it was the duty of The evidence in the record, for example, on spread, there was evidence at 2.5 spread, there was evidence at 2.75. There was evidence that could be concocted at 2.25. But trial judges make those decisions every day. I mean, did it make any difference that we were talking about employer health and welfare plans that had fixed premiums and a claims history? It seems to me those numbers are pretty concrete. Whereas here, it's a little squishier to try and figure out. A little squishier, except we had contemporaneous valuations in this case, remember. We had an actual transaction. We knew how much home thought it was paying for these. We knew how much. What about the discrepancy between the reports filed with the SEC and the experts' assumptions? They differed widely, and I think they were four days apart, right? There's a really big difference between the experts' assumption and the contemporaneous evidence. I don't believe there is, Your Honor. There was in 1986, if you take 1986, as the projections in the SEC report were actually higher. And that was explained because in the SEC report, home did a straight line projection of growth. The expert, homes expert of the case, did an S-curve. An S-curve is a little slow at the start, accelerates. They reached the same result at year 10. And, in fact, the projections, you don't have it fully in the SEC record. You have to go to the Pete Marwick. After year 10, those projections exceeded the projections of the home expert. What did you want the district court to do with that? To make a fine? We wanted the district court to endorse our findings. But short of that, to make some interim finding, I guess, something between that, I mean, it was easy to straight line it if you wanted to straight line it. But the problem is it's sort of a qualitative, you know, it's the number of holes and the size of the holes and the assumptions. And so I guess what would help me most is if you can draw my attention to any case law that approaches the result you're asking us to reach today, where this level of ambiguity in the record is patched up by a district court judge. Capital Blue Cross, the Arm Smith case, both of those are in the Third Circuit. There are a lot of cases where hard-to-value assets, this is no harder to value than most intangible assets, patents, royalties from any sort of intellectual property, are valued all the time by courts. I know in Alaska we have to value the pipeline. I mean, I understand, and again, for me it's a question of sort of the degree of what you were expecting her to do. So those are the cases you want me to look at? Yes. Yes, absolutely, Capital Blue Cross. Do you want to save some time? I would like to save the minute and 20 seconds. Okay. All right. Thank you. Let's hear from the Commissioner. May it please the Court. I'm Arthur Catterall of the Justice Department. The district court correctly held that the taxpayer failed to satisfy its burden of establishing homes cost basis in these regulatory rights that it obtained in connection with the transaction that happened 35 years ago. Given the numerous flaws that the Court found in the taxpayer's valuation analysis and the fact that all of those flaws derived from the government's comprehensive attack on that valuation during an eight-day trial, the Court's factual finding that the taxpayer's evidence was not reliable enough to support a value anywhere close to the claimed value is at the very least based on a permissible view of the evidence and therefore may not be disturbed. Now, the taxpayer's main argument on appeal is that regardless how deficient its evidence was in terms of the claimed value, if that evidence would support some estimate of value, then the district court was required to assign some value to the rights. And that's simply not how the burden of proof works in the context of a tax refund suit. In a refund suit, the taxpayer's burden of proof extends beyond merely establishing that he overpaid his taxes. Rather, he must prove the amount by which he overpaid his taxes with reasonable accuracy. And where that amount depends on the value of an asset, the taxpayer must prove that the claimed value of the asset is reasonably accurate. Counsel, for some of these what I'm calling holes, you didn't — of course, the government didn't offer a countervaluation. Correct. Which is one of their implied disappointments, at least, but did offer expert testimony that contradicted. And some of that transcript testimony reads to me as though the government's expert was saying, well, here's a number that I think would be a closer estimate, and then was pretty quick to say, this isn't really the estimate, sort of offering it for illustrative purposes. The government's trying to have it both ways on some of those — in some of those circumstances. So he just pointed out a few where your expert came — Mr. Mann. Right. And I don't think he was — Yes. Why? Because those valuations are nowhere near the claimed value. That's what — that's what — You know what? That just means he would win less. No, no. What would have been wrong is a matter of — I'm asking — That's not how it works in a tax refund case. I'm sorry. Go ahead. Thank you. My question is, what would have been wrong with the judge using some of those valuations, in other words, rejecting the plaintiff's valuations, but using some of those that were offered by your expert to plug some of these holes? Yes. It would have been wrong. Because the taxpayer's burden was not to prove that these rights had some value. Its burden was to prove that it — that its claimed value, which was 200-and-something million, is reasonably accurate. But now you're telling me what I already know, and I'm asking a really different question. Just a matter of — his position is that she was really obligated to fill in these holes. I've asked him whether she had to fill in all of them, whether she had evidence to say yes twice. On some of those holes, what I'm calling holes or invalid assumptions, your expert offered competing numbers. Could she have used those? Yeah. I don't know that I'd call it competing numbers. I think basically the purpose of that testimony was to show how sensitive, you know, the inputs were to just minor changes in valuation. Now, if this was a deficiency case in the tax court and the — so, in other words, if HOME had filed its tax returns consistent with what it's claiming now, and the IRS came in and audited and said, nope, you don't get any of these deductions, you know, these things have zero value. Then — okay, then you go to the tax court, and the taxpayer basically just has to show that whatever the, you know, the value that the IRS put in the notice of deficiency was wrong. It doesn't have to prove, you know, what the exact amount is. So what you're saying, I think, if I can — if I understand you correctly, is her job was to determine whether the amount claimed by the taxpayer was established by the evidence supply. With reasonable accuracy. With reasonable accuracy. If she found it was not, she's not saying it's not worth anything. What she's saying is, I can't determine what that number is on the basis of this record. Right. So you're still not answering my question, are you? Do you want to take another run at it? Sure. I'm listening. Okay. Why couldn't she? I think the first answer to the question is, you think that she didn't have everything she needed to plug all of the holes. She didn't have a reasonable evidentiary basis to do that. Sure. Okay. So it's a different question. As to some of these, it seems to me that she might have. She could have used your expert's testimony. And your position is, no, she couldn't have, even for some of them. Correct. And my question is, why not? Because she's not a tax court judge. That, you know, again, in the deficiency context, I mean, this is just how it works. I think you've given it your best shot. Thank you. Okay. But, I mean, in the deficiency context, again, so it's the IRS that's coming in and saying, no, this isn't worth anything. So the taxpayer's burden is just to show that that's not correct. It doesn't have to prove the correct value. Once it proves that what the IRS said in its notice of deficiency was wrong, then this presumption of correctness that the notice of deficiency is afforded falls away. And that's the situation where the court is required to come up with a value based on the evidence in the record. In that situation, it may not be as high as $200-plus million, but the tax court is obligated to say what the number is. Yes, generally speaking, yes. And that's the difference between a deficiency and a refund action. And that's crucial to this case. Right, and I think it's covered thoroughly in your briefing. So I think we all understand that. Okay. Did I interrupt you? No, no, I think that answer helps. Let me just point out one thing. You know, if this rule seems, you know, this burden of proof rule seems a little harsh, the IRS itself is not entirely immune from the same rule. And that is, if you're in a deficiency setting and the taxpayer goes to tax court and proves not only that the IRS's figure in its notice of deficiency was wrong, but that it was completely arbitrary without foundation, then the IRS has the burden of proving a figure, an amount. And this court has not hesitated to hold the IRS to that burden in cases like that. And in that case, Mr. Catterell, if the trier of fact, the tax court, concludes that there has been a failure of proof, does the whole deficiency notice go away? Yep, yep. So the tax return stands as filed. Correct. And the two cases I'm thinking of, the two Ninth Circuit cases I'm thinking of, are called Morrissey v. Commissioner. That's 243 F. 3rd, 1145. And a state of Simplet v. Commissioner, 249 F. 3rd, 1191. I think it's Simplot. It certainly is spelled Simplot. I went on Google to see how you pronounce that. They're a big potato grower in Idaho, a major employer. And which of the pronunciations said Simplot? We get lots of Simplot cases. But I will say Simplot. Trust me on this one. You might want to trust us on this one. I will call you Simplot. He's the French fry king or something? Yeah, okay. He's the French fry king. Okay, yeah. And those two cases, it was the IRS that did not meet its burden of establishing a figure and then so lost entirely, reversed and rendered. So this rule doesn't only apply to refund situations. And this burden of proof rule that we're talking about that applies to taxpayers who are seeking refunds based on a changed reporting position is not limited, as the taxpayer would have you believe, to cases involving unsophisticated taxpayers who offer little or no evidence to support the new valuation. And the good example of that, I mean, it applies equally to cases involving highly sophisticated taxpayers who offer extensive evidence that is simply seriously flawed. And the example of that is the Trigon case out of the Eastern District of Virginia, which involved the former Blue Cross Blue Shield of Virginia. The case involved a seven-day trial. Taxpayers submitted 13 volumes of exhibits, testimony of two experts, each of whom had more than 20 years of experience valuing intangible assets. And as a threshold matter, the Trigon court expressly found not only that the intangible assets at issue, which were these group health insurance contracts, could be separately valued, but that the methodology used by the taxpayer's expert, which was the discounted cash flow method, which is the same method that was used here, was capable of valuing the contracts if properly applied. But the court found, though, that because that discounted cash flow method is so input sensitive, that it was of critical outcome determinative importance that the inputs used to arrive at the valuation were accurate and reliable. And the Trigon court went on to find that the expert used inputs that consistently inflated the purported value of the contracts. Is that your best authority? It is a wonderful case. I would think you would like it. I'm looking at it. Trigon, the case out of the Eastern District of Virginia, that's my problem there, too. What do you want me to look? Well, the one that has sort of all the nuts and bolts is the one that's, I believe, is 215 F sub second. Okay. Thank you. And then after the court denied or entered judgment, then the taxpayer filed a motion to reconsider, basically making the exact same arguments that the taxpayer makes here. In particular, and this is in the 234 F sub second, Trigon argued that the court, having found that Trigon was theoretically entitled to claim losses from the termination of the contracts, quote, made an error of law in failing to estimate the amount of the refund, notwithstanding that Trigon's valuation evidence was found neither credible nor sufficient. Trigon asserts that it met its burden of proving that it was entitled to some deduction, but merely failed to quantify the amount of the deduction. In such circumstances, Trigon argues, the court has a responsibility to estimate the amount of the claim deduction and the failure to do so in this case, Trigon says, constitutes clear error, end quote. And in denying that motion, the court explained that what Trigon was describing was basically the burden of proof in a deficiency setting, not in a refund setting. And the taxpayer here does not argue that Trigon was wrongly decided, doesn't argue that Trigon is somehow distinguishable on the legal issue of how the burden of proof operates in this context. They simply ignore it. So that's the case I would commend to you reading both of those opinions. And if I may get to the issue of the abandonment loss, there's two ways under the regulation, there's two ways that you can abandon an intangible asset. Such that you're entitled to a loss deduction. Either you discontinue the business to which the intangible relates, or you overtly abandon the asset itself. And, of course, in order to overtly abandon an asset, you have to be aware that the asset exists in the first place. And in 1993, HOME had yet to claim that it owned a separately identifiable asset called a branching right. So they obviously, you can't abandon something you don't even know you have. So HOME has to rely on the discontinuation of the business prong. And the district court correctly held that the relevant business here was not HOME's nationwide savings and loan business. And that's because discontinuing the Missouri operations didn't destroy or even diminish the right to reenter that market at a later date, if HOME so chose. So this, you know, what this is, this branching right is sort of a right to reenter the Missouri market. And so necessarily that has value for your business outside of Missouri. You know, it's a way you can expand your business outside of Missouri into Missouri. So simply by discontinuing its Missouri operations, that did not affect an abandonment of this licensing right because, again, the relevant business is the nationwide savings and loan business that HOME was conducting. And unless there's any other questions, I will sign off. I think we have the government's position. Give our regards to the commissioner. All right. If I might pick up just initially on the abandonment issue, I think the government's argument is rather silly, that HOME didn't know that it was aware, HOME was not aware that it had a branching right. That was the entire object of this transaction. The tax department might not have been aware that it was abandoned in 1993, but the tax department does not drive the law in this case. The law is reality. I understood the argument, though, to be a little broader than that, that they didn't really abandon the right because they retained the right to reenter and that had value to a financial institution that does business nationwide, should it become the object of a takeover or a merger, that the partner might find that it was good that they could reenter. There are many cases, such as the A.J. Industries case in this circuit, where there is an intangible right that is not physically discarded because you can't transfer it. We had no right to transfer it. But you can nevertheless abandon it if you stop your business, if you terminate your business. The only business in which this right had any value was taking it. But you have to permanently do so, right? And the government's position, as I understood the argument, was that they didn't permanently abandon it. That's the first prong of the test. The second prong is that you've abandoned the business, that you've stopped the business, in which case. Remember what we're doing here is our tax is on net income. At some point, you get to deduct costs. If the asset has no terminal life, then you don't get to deduct it until it ceases to have use in your business. It might continue to have use somewhere else, but that's the law. Let me get to some of the valuation.  We all know that, even the government. Is it zero or I find a failure of proof, therefore judgment for the commissioner? But the result is zero. Well, there's a big difference. Well, you don't get the refund. There's a big difference. She didn't find zero. She found your client didn't meet its benchmark. That's right, with the result of zero. But the result is that you don't get a refund. And, yes, that is a zero result. But there is a distinction here, isn't there, counsel? Well, certainly the way you get to it, but the result is zero, which we all know is the wrong answer. Home paid a substantial amount for these rights. We know that. Well, you still have the burden to prove how much, and you've been candid in conceding that you recognize you had a burden, and you're not saying it went away. So what's wrong with this decision? I think, if you go back to the government's argument, that if we had said a value was 150 and they came in and said 50, I think it's the court's obligation at that point to find a value either of 50, 150, or somewhere in between. And they didn't do that. And the court didn't do that here. That's the burden of proof argument that we make. You're right. We had some clearly erroneous arguments on the right, a variety of these. We feel wronged in that respect. But the burden of proof argument is our primary argument. And the government's defense of, well, if we said 150 and the government comes in with 50, we lose, just has to be wrong. This is an intangible asset. It is very difficult. I'm not saying it's easy to value. It's very difficult. If you go back to the Claude Felder case, which is a Ninth Circuit case, the difficulty of valuing an asset is not an excuse. The court has to come up with a value, assuming there is evidence in the record. But the cases on which the government relies for no evidence in the record is the person who's deducting. Assuming that the evidence in the record meets the line of the burden of proof. And as I understand the court's decision, she found you didn't get to that line. I don't think that's what she said. That's how I read her opinion. I think you're right that there are some places, some of these components, what I'll call them, components or assumptions where she had something from the government's expert where she could have plugged some of your holes. What's hard for me is your argument that she had what she needed to really come up with this answer. Setting aside the burden of proof issue, I didn't have any luck getting the government to answer this point. I think your argument is persuasive, but it doesn't get you all the way there, does it? What's your strongest case authority? It would be the Capital Blue Cross case. All right. And if you go back to the way the trial judge there recounted what happened, it was a litany of errors and a method that allowed no valuation. That's not true. A discounted cash flow method, if you have the input, it spits out a value. Counsel, thank you very much. The case was very well argued. It's always a pleasure to have good lawyers on a hard case. Thank you. We'll get you an answer as soon as we can.
judges: Tallman, Christen, England